Thomas A. Fleener
119 Grand Ave
PO Box 913
Laramie WY 82073
307-460-4333
fax: 866-572-8015

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CR-00224-WFD |
| | ) | |
| SERGEI PAUL LUDWIG, | ) | |
| | ) | |
| Defendant. | ) | |

---

**MOTION TO SUPPRESS EVIDENCE**

---

**COMES NOW**, the Defendant, Sergei Paul Ludwig, by and through his attorney,

Thomas Fleener, and hereby respectfully requests this Court to order the suppression of all

evidence seized as a result of an illegal seizure and search of the Defendant's motor vehicle, as

well as any statements made by the Defendant, and any and all evidence subsequently discovered

as fruits of the poisonous tree.  In support of this motion, the Defendant states as follows:

**STATEMENT OF THE FACTS**

Sergei Paul Ludwig is charged with violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C),

1

Possession with Intent to Distribute MDMA/Ecstasy.  These charges arise from a traffic stop and

subsequent search of the Defendant's vehicle conducted by Trooper Chatfield of the Wyoming

Highway Patrol on Interstate 80 on August 26th, 2008.  The facts of the case are these:

On August 26, 2008 at 13:30:48, the Defendant's vehicle passed Trooper Chatfield's

stationary position on Interstate 80 travelling eastbound at eighty-five miles per hour.  At

13:31:04 Trooper Chatfield's patrol car left the median of the Interstate and began pursuit of the

Defendant's vehicle.  At 13:31:15 Chatfield illuminated his overhead lights, and accelerated to

high speed to close the distant between his vehicle and Ludwig's.  At 13:32:17 Chatfield caught

up to the defendant's vehicle and slowed to match its speed.  At that precise moment, the

Defendant crossed onto the shoulder of the road and applied his breaks.  The patrol car video

shows the Defendant applying constant pressure to his breaks until the Defendant's vehicle

comes to a complete stop at 13:33:01, exactly forty-four seconds after Chatfield matched speed

behind him.  At no time during the stop did Chatfield ever engage his patrol car's sirens.

At 13:33:10 Ludwig is contacted by Trooper Chatfield, who explains the reason for the

traffic stop and asks to see Ludwig's license and vehicle registration.  The Defendant hands

Chatfield some paperwork, including a Fraternal Order of Police card.  Some small talk is made

which is mostly inaudible due to the high winds obstructing Chatfield's audio recording device.

At times the winds are strong enough that items can be seen being blown across the camera's

field of view.  It can be surmised from Trooper Chatfield's testimony at the December 3rd, 2008

suppression hearing (hereinafter "hearing") and from the available audio which *is* intelligible that

the Defendant indicated that he was travelling from San Jose, California to New Jersey on

business, and that he was "scared of flying."  The Defendant is ordered out of his vehicle by

Chatfield and directed to follow him back to his patrol car.  As Chatfield walks back to his car,

he speaks into his microphone that the Defendant was "very, very … very nervous."  In the Government's Response to the Defendant's Motion to Suppress, some emphasis is placed on this fact.  Govt. Resp. at 3 (Nov. 7, 2008).  It should be noted that this appears to have been a deliberate attempt by Chatfield to begin building an audio record against the Defendant, rather than an impromptu comment made by him.  A critical examination of the audio cannot help but yield such a conclusion.

> 13:34:40: [*Chatfield reenters patrol car.*]
> 13:34:41: Chatfield: Very, very –
> 13:34:42: [*Radio traffic cuts off Chatfield's comment.*]
> 13:34:45: Chatfield: – very nervous.

Had this comment been an impromptu reflection by Chatfield on the Defendant's true state of nervousness, being cut off in midsentence by the squawk of his radio would not have caused Chatfield to pause for three seconds before continuing his sentence upon the cessation of radio traffic.  Instead, his actions demonstrate that Chatfield wanted his words recorded, and that he intended from the beginning of the stop to build a record against the Defendant.  While there is nothing unlawful in such an approach, it is helpful to keep this fact in mind while examining the remainder of the facts of this case.

At 13:34:55, the Defendant exits his vehicle and joins Chatfield in the patrol car. Chatfield tells him that he will receive a citation for speeding, and is questioned by Chatfield concerning his employment and travel plans while the citation is being completed.  Inside the patrol car and out of the wind, the conversation is intelligible almost in its entirety.  The following is a word-by-word transcription of the conversation with occurred within Chatfield's vehicle, beginning at 13:35:14 when Chatfield tells Ludwig to take a seat in the patrol vehicle and terminating at 13:42:32 when the Defendant begins to return to his car.

3

Chatfield:      Go ahead and have a seat.

Chatfield:      I'm going to issue you a citation for going eighty-five in a seventy-five. I have to fill out the citation here.  Is it okay if I ask you a few questions while I do that?

Ludwig:         Sure.

Chatfield:      Is this your current address here in Westminster Avenue.

Ludwig:         Yes.

Chatfield:      And whose vehicle is it?

Ludwig:         It's uh, technically that's my best friend, Robert.   Uh, I work with him, and when I got the car, my credit was pretty bad, so one thing, sort of as a co-signing thing, he had to be the primary account holder.  I pay on it.

Chatfield:      So basically it's your car, it's just in his name, is that what you're saying?

Ludwig:         Yes, sir.

Chatfield:      How long were you out in California?

Ludwig:         Oh, about uh, four days.  I don't suppose there's any chance you could just give me a warning citation, would there be?

Chatfield:      No, no.  Eighty-five in a seventy-five is a pretty serious out here, this is a – what we call – a high enforcement zone because we have so many crashes in the middle of nowhere out here they want us to really strictly enforce the law out here.

Ludwig:         Hmm.

Chatfield:      So I'm kind of under strict orders to write citations on especially eight to ten miles an hour.

Chatfield:      So you were working out in San Jose, you say?

Ludwig:         Yes, sir.

Chatfield:      Who were you working for?

Ludwig:         I was working for a company called CalPop.  It's a company out in, uh, New Jersey that has servers in California and sometimes you need human intervention – but you can't do everything remotely.  So now we're going to be upgrading the servers' parts.  I mean, the one they had me working on was on the verge of failing.  We were implementing a new policy for the security, uh systems and so on and so forth.  It's best to actually be there.

Chatfield:      So you're currently employed by this CalPop out in New Jersey?

Ludwig:         No, I'm not, I'm employed by uh, Elegy in New Jersey.  We have, I mean I do consulting work, so if they have a problem with one of their clients, like I said, you know, we have servers all over the country, sometimes in other countries as well, and uh, sometimes we have to travel [inaudible].

Chatfield:      How – how long ago did you leave California?  Have you been driving all night or –

Ludwig:         No, I did sleep.  I think I left Monday in the uh, early afternoon, and then – probably went to bed – probably around two thirty.

Chatfield:      Stay in a hotel or just sleep in the car?

Ludwig:         Um, I actually stayed in the car this time, cause I thought to myself that by the time I got tired it would kind of be a waste to, uh, get a hotel room

|             | since I wanted to like drive during the day – better , easier to see, all that good stuff. |
|-------------|---|
| Chatfield: | [*Tears ticket out of book.*] Ok, this is a citation for going eighty-five in a seventy-five.  I just need you to sign by the "X" that you promise to either appear in court on September 17th or mail $95.00 to the courthouse. |
| Chatfield: | There's all that, and a copy of the ticket, and that explains how to take care of it.  Have any questions about anything? |
| Ludwig:    | No, I don't think so, um. |
| Chatfield: | Okay, you're free to go.  Have a safe trip. |
| Ludwig:    | Thank you.  Have a good day. |

The Government Response Brief mentions that Ludwig "frequently cleared his throat" during the encounter.  Govt. Resp. at 4 (Nov. 7, 2008).  The audio recording shows that Ludwig cleared his throat exactly four times.  The exchange within the patrol vehicle lasted from 13:35:14 to 13:42:38, just over seven minutes.  Whether there are any outward manifestations of nervousness in the audio recording is subject to serious question.  Three seconds after Ludwig exited the vehicle to return to his car, Chatfield exited his patrol car and reinitiated contact.

| Chatfield: | Sergei?  Would it be okay if I asked you a few more questions?  Would that be okay? |
|-------------|---|
| Ludwig:    | Uh, I'd like to get on my way, but I mean, if you have to, uh – |
| Chatfield: | Sergei, I have reasonable suspicion you're hauling marijuana. |
| Ludwig:    | Really.  Well… |
| Chatfield: | Stand over there. |

At this point, Ludwig is ordered to stand on the side of the road while Chatfield deploys his canine unit.  The dog appears to alert to the driver's side door of the Defendant's vehicle at 13:44:14.  Chatfield retrieves the keys from Ludwig and begins to search the vehicle.  At approximately 13:54:00, Trooper Schulmeister arrives on the scene and begins to aid in the search.  At 13:55:50 Chatfield locates a false compartment beneath the rear bench seat and handcuffs Ludwig.  Chatfield radios for a tow truck and a mechanic, and conversation ensues between Chatfield and Schulmeister.

5

| | |
|---|---|
| Chatfield: | That guy was shaking so bad.  I stopped him for 85.  He hands me a Fraternal Order of Police card. [inaudible] …get his wallet out of his pants, and then he just – every time I asked him a questions he's got to swallow real hard, and it takes him a while to come up with the answers, and he comes up with some really crappy story. |
| Schulmeister: | Did he allow to you search it? |
| Chatfield: | No, he wouldn't, he didn't even allow me to ask him questions. |
| Schulmeister: | Ok, so you ran it? |
| Chatfield: | I said, "Is it okay with you if I ask you some questions?"  He goes, "I'd rather you didn't."  "Alright – I'm gonna run my dog." |

At 14:13:27 Lieutenant Adams arrives on the scene, and Chatfield engages him in conversation.  Included below are the relevant portions:

| | |
|---|---|
| Chatfield: | That guy was freaking nervous. |
| Chatfield: | He tells me after a while - I said, "where you coming from?"  He says, "San Jose, California."  "On vacation or work?"  And he goes, "I was working out there."  I'm like OK, and I bring him back and I thought, how long were you out there working?  And he said, "Uh, four days.  And I don't like to fly."  And I was like, "Well who do you work for?  And it takes him a while and he says Cal-Pro.  He comes up with a name and then says he doesn't actually work for them, he's a consultant that they've sent out from New Jersey to work in IT in California.  Northern California is the hub of IT in the world. |
| Adams: | So he didn't even have a computer? |
| Chatfield: | [*Laughs.*]  And they gotta – yeah.  And they had to send his ass – yeah, I think he does.  He's got a laptop.  You don't, you don't send a – |
| Adams: | Can he hear you? |
| Chatfield: | No. |
| Adams: | Can he hear us?  I was just wondering 'cause sometimes you can, you can hear. |
| Schulmeister: | I know. |
| Chatfield: | I don't, I don't think, I don't. |
| Schulmeister: | I don't think so, but I don't even know how that thing works. |
| Adams: | Well I used to turn it up when I was sitting in the car. |
| Chatfield: | And he was just, I mean, he couldn't even get a wallet out of his damn pants, his hands were [inaudible].  And he was shaking real hard, swallowed whenever I'd ask him a question, I'm like – |
| Adams: | Is it his? |
| Chatfield: | What? |
| Adams: | Is it his?  The car? |
| Chatfield: | No.  He says – he says it's his – he says a friend had to cosign on it, and his friend's name's on everything, but if you cosign on something your name's on it too.  None of what he was telling me was making any sense. |

6

| Chatfield: | I even wrote him a speeding ticket |
|---|---|
| Adams: | Just to make me happy.  In the target zone! [*Both laugh.*] |
| Chatfield: | That's right. |
| Adams: | I'm surprised he [tow truck] isn't here yet. |
| Adams: | [*Referring to Ludwig in the back of the patrol car.*]  He ain't got a lot of room in there. |
| Chatfield: | No, no he don't. |
| Chatfield: | I went up to do a consensual contact. "You mind if I ask you some questions?"  He goes, "I'd rather you didn't."  And that way I kind of figured that – [*laughs*] – and of course he was just complaining the whole time. |

During the course of the conversation, Lieutenant Adams *intentionally shuts his wireless microphone off* for a period of fifteen seconds, as indicated by the "E" icon displayed on his patrol car's video disappearing.  The conversation that ensues is inaudible on Chatfield's recording device as he is facing into the wind, and Trooper Schulmeister's video has not been made available to defense counsel.  Counsel for the Government has explained that Trooper Schulmeister's video was not furnished to them either.  Nevertheless, an investigative report furnished by the Drug Enforcement Administration lists as exhibits 5071 grams of drugs and *three* DVDs.  D.E.A. Rpt. of Inv. 1 (Aug. 31, 2008).  Attempts by defense counsel to recover the missing video have been fruitless.

Shortly after the conversation a tow truck arrives and transports Ludwig's vehicle to a secure area where the secret compartment is dismantled and eleven one-pound bags of MDMA are discovered.  The Wyoming Highway Patrol Arrest Report detailing the event is dated August 29, 2008 – three days after the stop in question occurred.  Arrest Rpt. 1 (Aug. 29, 2008).

On August 28, 2008, attorney Dan G. Blythe was appointed to represent the Defendant. On October 24, 2008, Mr. Blythe filed a Motion for an Order Suppressing Evidence, and a hearing was scheduled for December 3, 2008.  In his motion and at the hearing, Mr. Blythe's

7

argument for suppression consisted of two parts.  First, Mr. Blythe alleged the seizure of the

Defendant was unsupported by reasonable suspicion.  Second, he alleged that the subsequent

search was unsupported by probable cause.  Mr. Blythe based the second prong of his argument

on the fact that the drug dog that alerted to the Defendant's car was not trained to detect the

substance ultimately discovered.  This Court rejected both arguments.  Following this Court's

denial of the Defendant's motion, present counsel was retained.

## THE DEFENDANT'S PRIOR REPRESENTATION

Upon a reexamination of the facts of the case, it is somewhat apparent that the Defendant

did not receive adequate representation from Mr. Blythe.  This Court rejected Mr. Blythe's

second argument concerning the probable cause established by the alerting canine based on

incorrect statements of fact and law.  This Court ruled against Mr. Blythe's first argument

without being afforded the opportunity to hear the facts of the case effectively developed by

counsel.  Based on the supplementary evidence, law and argument presented herein, the

Defendant prays this Court to reconsider its ruling.

From Mr. Blythe's arguments and cross-examination of the Government's witnesses at

the suppression hearing, it can be surmised that he had not sufficiently familiarized himself with

the facts of the case or with the evidence.  At the hearing, the arresting officer felt compelled to

tell defense counsel how to play back the video in order to be able to hear the sound, to which

Mr. Blythe responded, "Well, I should have called you when I was listening to this."  Hrg.

Transcr., 8:22 (Dec. 3, 2008).  After some questioning of the trooper, Mr. Blythe stopped the

video and asked Trooper Chatfield if he should continue to play the tape.  "It just sits there for a

while, doesn't it?" Mr. Blythe asked the trooper.  *Id.* at 81:5-8.  The trooper replied that "[i]t

depends on … what's of interest to you."  *Id.* at 81:9.  Mr. Blythe responded, "Well … I don't

8

remember anything of significance after this," and shut off the video.  *Id.* at 81:16-17.  Almost every important aspect of the case occurred after the video was shut off, thereby leaving many of the most important facts of the case undeveloped.  The following motion is comprised of the arguments and observations, which should have been brought to this Court's attention in the December suppression hearing, but were not.  This motion also contains contrary issues of fact as fundamental as the drug dog's alert,  and legal issues such as the standard for reliability as stated by the 10th Circuit Court of Appeals.

**ARGUMENT**

The Government correctly states in its brief that when "determining whether a *Terry* stop is supported by reasonable suspicion, a trial court must examine the 'totality of the evidence' to determine whether the detaining officer 'has a particularized and objective basis for suspecting legal wrongdoing.'  Govt. Resp. at 9 (Nov. 7, 2008), citing *U.S. v. Arvizu,* 534 U.S. 266, 272 (2002).  As the Supreme Court stated in *Terry*,

> "The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.  And in making that assessment it is imperative that the facts be judged against an objective standard: *would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?*  Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than *inarticulate hunches*, a result this Court has consistently refused to sanction." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). (Internal citations omitted; emphasis added).

The question then for this Court to address is whether the facts of the instant case when viewed in their totality satisfy this objective standard, or whether they are more indicative of the

"inarticulate hunch" the Supreme Court has refused to sanction.  Specifically, did the facts available to Trooper Chatfield prior to the Defendant's refusal to continue questioning rise to a level sufficient to allow Chatfield to seize the Defendant against his will?  The Defendant contends they did not.

The facts of the case point unavoidably to a pattern of embellishment and manipulation of the record on the part of the arresting officer, Trooper Chatfield.  As demonstrated in the above-transcribed conversations, when Chatfield described to Schulmeister and Adams how he built his reasonable suspicion, he enumerated no more than five possible factors that contributed to his decision to detain the Defendant.  They were: 1.) the Defendant's nervousness, 2.) dissatisfaction with the Defendant's travel plans and work description, 3.) the fact that the Defendant's vehicle was not registered in his name, 4.) the Defendant handing him a Fraternal Order of Police card, and 5.) the Defendant's refusal of consent to continue questioning.  Of note, the presence of a F.O.P. card was later discounted by Chatfield at the hearing as common and immaterial.  Hrg. Transcr. 21:18-23 (Dec. 3, 2008).  As a matter of law, the Defendant's refusal to consent to questioning after the traffic stop had ended cannot be used as a factor in developing reasonable suspicion.  *See e.g., U.S. v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997).

Following the arrest of the Defendant, Trooper Chatfield waited three full days to write his arrest report.  By the time report had been generated, Chatfield had developed a number of other reasonable suspicion factors that went unmentioned in his play-by-play descriptions of the traffic stop to Schulmeister or Adams.  They are: 1.) the presence of a shirt hanging in the window of the Defendant's car, 2.) the Defendant taking more time than most vehicles to pull over, 3.) a strong odor of cologne or air freshener, 4.) that the vehicle had little in it other than snacks and a cooler, and 5.) that the Defendant visibly exerted extra pressure on his hand while

signing the citation, so as to avoid trembling.  Arrest Rpt. 2-3 (Aug. 29, 2008).  None of these

factors is supported by the evidence.  All five are directly and unquestionably contravened by it.

Chatfield's efforts to shore up his report with manufactured findings are indicative of the

Trooper's own knowledge that his stop as conducted was improper.  A law enforcement officer's

word is usually taken as sufficient evidence that a defendant was in fact speeding.  In this case,

however, Trooper Chatfield took the additional precaution of photographing his radar unit's

display, ostensibly to put to rest the question of whether probable cause existed for the initial

traffic stop.  In so doing, Chatfield memorialized not only the numbers on his radar display, but

the video output from his in-dash camera as well.  Photo 100_1062.  In small numbers, but

clearly discernible on the video screen is the timestamp 16:32:34, indicating that the photo

Chatfield offers here to prove that the Defendant was in fact speeding, was not taken until more

than three hours after the stop in question had occurred and Ludwig had been taken into custody.

Such action is consistent with Chatfield's ongoing efforts to cover his tracks, and suggest that the

trooper knows as well as anyone that his actions exceeded those permitted by the law.

### THE "SUSPICIOUS SHIRT"

In Chatfield's arrest report of 29 August, he writes: "When the vehicle drove by me I

observed the following: The vehicle was a gray Nissan with New Jersey license plates.  There

was one male occupant.  There was a shirt hanging in the left rear window."  *Id.* at 2.  At the

suppression hearing Chatfield testified as follows concerning the shirt:

> "…Oftentimes what I've seen and read about and seen other officers with is a --
> one article of clothing that really doesn't fit, and it just seems to be decoration.
>
> Q. To try to make -- to try to create what impression?

11

A. To try to create an impression of a businessman or somebody who is traveling who -- who is traveling for legitimate reasons, I guess." Hrg. Transcr. 23:11-17 (Dec. 3, 2008).

"…So -- and as a matter of fact, the -- I had a stop maybe a month before this where I had a seizure of marijuana in the trunk where the driver had what looked like a 20-dollar sport coat that didn't -- didn't even look like it would fit him, hanging in the passenger -- rear passenger -- or -- yeah, rear-passenger-behind-the-driver window." Hrg. Transcr. 24:6-11 (Dec. 3, 2008).

The Government suggests that hanging a single shirt in a car window is typical behavior for a drug courier; that the shirt is designed to make the traveler appear more legitimate in the event he is stopped by law enforcement.  Without commenting too much about the troubling implications of allowing the appearance of legitimacy as a factor in developing reasonable suspicion, it bears mentioning that at present only one Tenth Circuit case can be found which speaks to the subject of a hanging shirt or suit being used by a drug courier in the manner suggested by Trooper Chatfield, and that case is readily distinguishable by its facts.

In the unreported case of *U.S. v. Vasquez*, 2007 WL 853764, D. Utah (2007) (Only Westlaw citation is available) the court recognized the conspicuous display of a suit in a stopped vehicle as a factor in developing reasonable suspicion when the driver professed to be in the auto repair business, the driver's name was on a DEA watch list, and an NCIC check revealed a prior conviction for transporting cocaine.  In the instant case, Sergei Ludwig had no criminal history whatsoever, professed to be in the IT business, and was wearing the very same kind of dress shirt Trooper Chatfield says was hanging in his vehicle at the time he was stopped.  Recalling Trooper Chatfield's suggestion that a shirt could be a factor in developing reasonable suspicion if it "really doesn't fit, and it just seems to be decoration," there is some question if even by the trooper's own standard the facts of the case could give rise to any suspicion of illegal activity. Unlike the case of *Vasquez* where the state trooper found it implausible that a professed auto

12

repairman would be travelling with a business suit, or even of Trooper Chatfield's own example of a sport coat that "didn't even look like it would fit" the driver, the article of clothing alleged to have been hanging in the Defendant's car was a simple shirt.  By Trooper Chatfield's own description, it was neither an item that "really didn't fit," nor one that would appear to any reasonable person as a mere "decoration."

But the basis of the forgoing argument presupposes that such a shirt was present at all. Fortunately, video footage from Chatfield's patrol car provides the viewer with a clear shot of the Defendant's vehicle through the side window as the Defendant comes to a stop on the side of the Interstate.  For all but four seconds of the video, Trooper Chatfield's vehicle is directly behind the Defendant's own, and no view is possible into the side windows.  But from13:32:52 to 13:32:56 the two vehicles begin to pull parallel to one another, and a clear shot through the side windows of the Defendant's vehicle demonstrates beyond any doubt that there is no shirt hanging in the window at all.  Nonexistent in the video evidence or in Chatfield's discussions with the other officers at the scene, the suspicious shirt appears for the first time three days after the events in question in Chatfield's late-filed report.

## PULLING OVER

The second factor added to Chatfield's arrest report but unmentioned in his discussion with either Schulmeister or Adams is "the fact that it took Mr. Ludwig a considerable amount of time to pull over." Hrg. Transcr. 5:4 (Dec. 3, 2008).  In his report, Chatfield asserts that the defendant took "a lot longer than most vehicles" to pull over.  Arrest Rpt. 1 (Aug. 29, 2008). Chatfield testified similarly at the suppression hearing, without suggesting what a normal amount of time for pulling over would be.  A timeline of events derived from Trooper Chatfield's

13

onboard video suggests that if any delay existed in the Defendant pulling over at all, it was quite minimal.

At 13:30:48 the Defendant's vehicle passed Trooper Chatfield's stationary position on Interstate 80.  Chatfield began pursuit at 13:31:04 and illuminated his light bar at 13:31:15.  By the time Chatfield's patrol car reached 85 miles per hour, thirty-five seconds had elapsed since the Defendant's vehicle passed Chatfield's stationary position.  Assuming a constant speed of 85 miles per hour (Trooper Chatfield testified that the defendant did not alter his speed until Chatfield was right behind him, see Hrg. Transcr. 15:20-24 (Dec. 3, 2008)) the Defendant had travelled more than eight tenths of a mile before Trooper Chatfield matched his speed and began gaining on him.  Chatfield then accelerated to 112 miles per hour, and caught up to the Defendant, beginning to brake at 13:32:08 and slowing to match Ludwig's speed at 13:32:17.  At that exact second, the Defendant's car began to pull over.  Six seconds later the Defendant's car was fully on the shoulder and had slowed to 66 miles per hour.  The Defendant's brake lights then light up and remain illuminated until the vehicle comes to a stop on the side of the road, demonstrating that the defendant in fact decelerated continuously until his vehicle came to a complete rest at 13:33:01.  From the time Trooper Chatfield caught up to the defendant and matched speed, only forty-four seconds had passed until the defendant pulled off the road, decelerated from eighty-five miles per hour, and came to a complete stop.  At no point in the prosecution's direct examination of Trooper Chatfield does he ever explain why the time it took the defendant to pull over was unusual or why it would have led him to suspect illegal activity. He merely claims without further elaboration that it was not normal, but never suggests, and is never asked by defense counsel what a normal time for pulling over would have been.

14

In its response brief to the Defendant's first motion to suppress, the Government cites *United States v. Walraven*, 892 F.2d 972, 975 (10th Cir. 1989) to illustrate failure to promptly pull over as a relevant factor for continuing an investigative detention.  In *Walraven*, however, the police officer followed the defendant's Cadillac for a mile and a half with his lights flashing and blasted his sirens twice without receiving any response from the vehicle.  *Id.* at 973. Additionally, the highway patrolman in *Walraven* testified that while following behind the vehicle, he observed the defendant adjust his rearview mirror and look directly at him, and some time later observed the defendant look over his shoulder out the rear of the vehicle directly at the highway patrolman.  *Id.*

Far from tailing the suspect for a mile and a half with lights and sirens blaring, in the instant case, Ludwig took forty-four seconds to pull off the road and completely stop his vehicle after Chatfield's patrol car caught up to his own.  Trooper Chatfield testified at the hearing that Ludwig travelled a quarter to a half mile after crossing on to the shoulder.  Hrg. Transcr. 16:19-20 (Dec. 3, 2008).  Chatfield never sounded his sirens.  Hrg. Transcr. 79:10 (Dec. 3, 2008). Ludwig never looked over his shoulder or in his rearview mirror.

The ultimate conclusion from the video evidence is that the stop at issue *did not* take unusually long and is substantially distinguishable on several points from the *Walraven* case cited by the Government.  No mention of Ludwig taking an inordinately long time to pull over is mentioned by Chatfield to his fellow officers at the time of the stop, and the video suggests the timing of the event to have been fairly innocuous.

## STRONG ODOR OF COLOGNE OR AIR FRESHENER

The third factor that went entirely without mention until three days after the traffic stop

15

was the "strong odor of cologne or air freshener" Trooper Chatfield described in his arrest report. Arrest Rpt. 2 (Aug. 29, 2008).  At the time of the stop, no mention is made of the smell to or by Trooper Schulmeister or Lieutenant Adams, though both entered the Defendant's vehicle during the search, and thus would have been even *more* exposed to any smell than Trooper Chatfield could have been while standing outside the Defendant's vehicle during the demonstrably high winds.  In fact, when Lieutenant Adams later arrives on scene and examines the rear passenger area where the hidden compartment is located, he smells the area to try to determine the identity of the substance hidden within.  His remark is telling.

> 14:14:10: Chatfield (to Adams): This is glued down, of course.  And see that, see it?
> 14:14:16: Adams: Oh yeah. [*Knocks on compartment.*] Nice.  *I don't smell anything.*

Later at the suppression hearing, Trooper Chatfield would testify that the smell was so overpowering that as the window came down it hit him in the face.  Hrg. Transcr. 19:11 (Dec. 3, 2008).  Had there actually been an overpowering odor of cologne or air freshener as Trooper Chatfield described, it seems unlikely that Lieutenant Adams would have observed that he "smelled nothing."  A more likely response would have been something on the order of, "I can't smell anything because of all that cologne."  The following excerpt is from Trooper Chatfield's testimony at the suppression hearing.

> Q. In addition to those observations, were you -- did you notice anything else about odors or aromas from the vehicle?
>
> A. Yeah. There was strong odor of cologne. As the window came down, it came out and kind of hit me in the face.
>
> Q. Did you -- did you see like an air freshener or anything like that hanging from the rear-view mirror?
>
> A. Not that I remember. I didn't see anything that would cause me to believe that that's where the odor was coming from.  Hrg. Transcr. 9:8-16 (Dec. 3, 2008).

16

Asked specifically if there was "an air freshener or anything like that hanging from the rear-view mirror," Chatfield replies, "Not that I remember."  The very first photo taken of the defendant's car is a frontal view of a Nissan Altima with an air freshener hanging from the rear view mirror.  Photo 100_1049.  It is especially noteworthy that Trooper Chatfield's initial description of the encounter to Schulmeister and Adams never mentions any smell or odor, and that neither of the other two officers at the scene made any comment about the alleged smell, even though both were inside the Defendant's vehicle at various times during the search and after.  But by the time a written report is filed three days later, Chatfield recollects a "strong odor of cologne or air freshener."  Four months later at the suppression hearing, Chatfield has narrowed the smell to cologne only, suggests there was no air freshener, and describes the odor as so strong that in the midst of the high winds typical of the area, the smell hit him in the face as the defendant rolled down his window, in spite of the fact that Lieutenant Adams while inside the vehicle and making a deliberate attempt to identify any smells coming from the it is heard saying clearly, "I don't smell anything."

The totality of the evidence suggest that there was no overpowering smell in the automobile at all, but rather that the alleged "masking agent" was a factor manufactured by Trooper Chatfield to prop up his report after the fact.

## CONTENTS OF THE DEFENDANT'S VEHICLE

The forth factor unmentioned by Chatfield at the time of the stop, but added to his report three days later is the suggestion that the Defendant's "vehicle had very little in it other than snacks and a cooler in the back seat."  Arrest Rpt. 2 (Aug. 29, 2008); Govt. Resp. at 3 (Nov. 7, 2008).  Far from the truth, a review of Chatfield's own photos and the police inventory

17

performed on the Defendant's car show a plethora of items in the passenger compartment of the automobile.  They include a shoulder bag, a cooler, a bag of beef jerky, a backpack, a water bottle, two packets of cigarettes, three shirts crumpled on the rear floorboard area, a pair of blue jeans, various music CDs, an iPod, a shopping bag, and the following three books on CD: *The Brothers Karamazov* by Fyodor Dostoevsky, *1984* by George Orwell, and a biography of Alan Greenspan – hardly material suggestive of the criminal profile Chatfield attempts to build against the Defendant.

The Government did not heavily rely on Chatfield's assertion that the vehicle was nearly empty, likely because the evidence so clearly shows such an assertion as blatantly false.  In fact, Chatfield's claim that there was very little in the vehicle other than snacks and a cooler goes entirely without mention at the suppression hearing.  Nevertheless this disparity between the facts of the case and the facts as offered in Chatfield's arrest report is presented here to further demonstrate an ongoing and demonstrable pattern of embellishment and prevarication on the Trooper's part.  It should go without saying that such undeniable and deliberate distortion of the facts must give any prudent person pause when deciding the degree of deference to afford Trooper Chatfield's testimony in all other regards.

## THE DEFENDANT'S TRAVEL PLANS

A critical examination of the transcript of the stop reveals that there was nothing overly unusual in the Defendant's explanation of his travel plans.  And though Trooper Chatfield may have found them curious, this Court applies an objective standard when determining whether a reasonable suspicion existed sufficient to justify a defendant's seizure. *Terry* at 22.  Chatfield explained his suspicions at the suppression hearing thusly:

18

"So it -- it seemed odd if not implausible to me that if he was -- this was what was going on in my mind. If he was such a valued IT consultant that a company had hired him from another company for him to go all the way out to California to work on the server, that they wouldn't be paying his expenses and that he would borrow a car, sleep in his car, be there to work over the weekend. It wasn't making sense to me." Hrg. Transcr. 28:11-18 (Dec. 3, 2008).

Chatfield explains that his suspicion over the Defendant's travel plans had four components. First was the question of why Ludwig's employer wouldn't be paying his travel expenses. It may be noted in the transcripts that there is no mention or implication of travel expenses by either Trooper Chatfield or the Defendant made during the contact at any time. Second is the question why Ludwig would have had to borrow a car for the trip "if he was such a valued IT consultant." Again, nowhere in the transcript does either party say anything about Ludwig's car being borrowed. To the contrary, the exchange concerning the car's registration occurred as follows:

> Chatfield:   And whose vehicle is it?
> Ludwig:   It's uh, technically that's my best friend, Robert.   Uh, I work with him, and when I got the car, my credit was pretty bad, so one thing, sort of as a co-signing thing, he had to be the primary account holder.  I pay on it.
> Chatfield:   *So basically it's your car*, it's just in his name, is that what you're saying?
> Ludwig:   Yes, sir.

The day following Ludwig's arrest, DEA agents were dispatched to the vehicle owner's residence in Clifton, New Jersey and learned that the owner, Robert Disiena had "purchased the vehicle for Ludwig because both subjects were close friends and Ludwig had bad credit and could not afford the vehicle on his own. Disiena stated that Ludwig would make periodic payments to Disiena for utilizing that vehicle." D.E.A. Rpt. of Inv. 2 (Sept. 2, 2008). Ludwig's explanation of the ownership arrangement was not only consistent with the truth, but was entirely consistent with innocent travel such that, in the absence of contradictory information, it cannot reasonably be said to give rise to suspicion of criminal activity. *Wood* at 947.

19

Chatfield's third factor was Ludwig's statement that he had slept in his car the night before.  The Defendant elaborated that by the time he became too tired to drive, it "would have been a waste to get a hotel room," an explanation that should have quelled any of Chatfield's suspicions.  The fourth factor was that Ludwig had worked on the weekend.  Aside from noting that the weekend seems the most logical time to service a business's computer networks so as not to cause unnecessary downtime during normal working hours, the Defendant dismisses these factors as innocuous and insubstantial without seeing the need for further commentary.

Some mention is made of the fact that Ludwig indicated to Chatfield that he was driving because he was scared of flying.  The Tenth Circuit addressed dismissed the use of such a factor in the case of *U.S. v. Salzano*, 158 F.3d 1107 (10th Cir. 1998), holding that "the decision to take the time and expense to drive, rather than fly or use some other mode of transportation, cannot support a reasonable suspicion of criminal activity." *Id.* at 1112.

Chatfield's explanation of how he found the Defendant's travel plans to be suspicious is unworkable and illogical.  It employs factors unsupported by the evidence and arrives at conclusions unsupported by common sense.  The ultimate conclusion is that no rational evaluation of the Defendant's travel plans would have caused a reasonable person to suspect that criminal activity was afoot.

Lastly, had the Defendant's answers to Chatfield's questions provoked the trooper's curiosity, it would seem logical to require the questioning officer to seek clarification on any points he found suspicious.  Trooper Chatfield is far from an expert in the computer industry, or in any number of the other wide-ranging and multitudinous occupations specialized in by the hundreds of thousands of innocent motorists travelling the nation's highways every day.  It is apropos to note the old adage, that to the man with a hammer, everything looks like a nail.

20

Had Chatfield sought clarification, the Defendant's explanation of his employment arrangement would likely not have struck him as unusual at all.  The Defendant did indeed work as an IT specialist for the New Jersey firm he described, and that firm did indeed regularly maintain computer servers in California and abroad.  This is a situation where "the facts known by the police cry out for further inquiry … when this is the case it is not reasonable for the police to proceed on the theory that 'ignorance is bliss'." W. LaFave, *Search and Seizure*, § 8.3(g) (2d ed. 1987).  Chatfield cannot willfully remain ignorant of facts that would otherwise dispel his alleged suspicions.  Rather, he has an obligation to pursue the statements by the Defendant that give him reason to pause.  To allow otherwise would permit an officer to deliberately avoid those items of clarification that would set the enormous majority of law-abiding motorists apart from those few for whom suspicion is warranted.

## THE DEFENDANT'S NERVOUSNESS

In *Wood*, a Kansas state trooper pointed to several factors which contributed to his reasonable suspicion that the defendant was trafficking drugs.  Not unlike the case at bar, the chiefest among them were the defendant's strange explanation for his travel plans and the trooper's observation that Wood was "extremely nervous; his breathing was rapid, his hands trembled as he handed over his driver's license, and he cleared his throat several times." *Id.* at 944.  Chatfield's description of Ludwig's nervousness is in almost identical terms, but included a note that the Defendant also had difficulty in removing his wallet from his pants.  Arrest Rpt. 2 (Aug. 29, 2008).  What Chatfield failed to report was that Ludwig is six feet three inches tall, weighs two hundred seventy pounds, was driving a Nissan, and had his wallet in his front pants pocket.  In a discussion with Lieutenant Adams after Ludwig was arrested and placed in the

21

patrol car, both officers note that Ludwig was visibly cramped in the confined space.  Adams noted, "He ain't got a lot of room in there."  Considering the Defendant's size, the limited movement afforded him in the Nissan, and the location of his wallet, the fact that the Defendant experienced some difficulty in retrieving his wallet is probative of nothing.

The *Wood* Court spoke at some length to the issues of nervousness at a traffic stop.  Their commentary is helpful here, especially given the similarity of the factors in question.

> "It is certainly not uncommon for most citizens-whether innocent or guilty-to exhibit signs of nervousness when confronted by a law enforcement officer.  [The state trooper] had no prior acquaintance with [the defendant] which enabled the trooper to contrast [his] behavior during the traffic stop with his usual demeanor.  We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on ... nervousness ... as a basis for reasonable suspicion ... must be treated with caution.  Thus, [the defendant's] demeanor during the detention must be discounted given the generic claim of nervousness." *Wood* at 948.

It should be noted that of all of Trooper Chatfield's assertions concerning the Defendant's nervousness, only the Defendant's pattern of speech and the fact that he cleared his throat are quantifiable in the video.  The remaining factors can be alleged at any traffic stop no matter the circumstances, without fear of contravention, since such things as lack of eye contact, shaking hands, and hard swallowing are not recordable and thus not disprovable.  Here however, a look to the carbon copies of the ticket issued by Chatfield on which he claimed the Defendant "visibly exerted extra pressure" while signing "so as to avoid trembling" clearly shows that the Defendant's signature is much lighter than Chatfield's own.  The trooper's generic contentions fall apart under scrutiny whenever any item of evidence exists against which they can be judged.

A review of the additional elements that are quantifiable demonstrates that there was no excessive throat clearing, and that the Defendant's speech pattern did not rise to the extreme

level of anxiety alleged by Chatfield.  From the suppression hearing:

> Q. Did, in fact, Mr. Ludwig's nervousness increase or remain at a high level throughout the course of the stop?
>
> A. It -- it remained at a very high level. *I don't know that it could have increased.* Hrg. Transcr. 31:10-13 (Dec. 3, 2008).

The fact that such hyperbole is contrary to the evidence is beyond argument.  The most cursory review of Chatfield's dash video reveals as much.  Chatfield's exaggeration under oath is yet another example of the trooper's intentional distortion of the facts in an attempt to give an illegal seizure some semblance of legitimacy.

## REFUSAL TO CONSENT AS FACTOR IN DEVELOPING REASONABLE SUSPICION

While not included in Chatfield's report, it is apparent from the video evidence that the Defendant's refusal to consent to additional questioning after the traffic stop had ended was the determining factor in Trooper Chatfield's decision to seize the Defendant.  As Chatfield relayed to Lieutenant Adams:

> Chatfield:   I went up to do a consensual contact. "You mind if I ask you some questions?"  He goes, "I'd rather you didn't."  And that way I kind of figured that – [*laughs*] – and of course he was just complaining the whole time.

What exactly was it that Trooper Chatfield "figured" based on the Defendant's refusal to consent?  The answer is obvious.  Chatfield "figured" that the Defendant was hauling drugs.  The following excerpt from Chatfield's direct examination at the suppression hearing is informative.

> "…When did -- when did you develop that suspicion? I mean, did you really need to wait till after you gave him the ticket and told him to go bye and have a good day and -- I mean, that's the highway patrol two-step. Did you really need it here?
>
> THE WITNESS: No, but as we always do try to -- consent seems to be the easier thing, especially since I don't know what's in the car.  It could -- he may be nervous -- you know, I assumed at that time that it was high-grade marijuana

23

simply on his origination and destination.  So I -- but I don't know that.
Oftentimes I wonder 'could it be PCP or something like that that the dog is going
to do me no good on.'  So I always try to get consent which requires the two-
step." Hrg. Transcr. 33:21-34:9 (Dec. 3, 2008).

Trooper Chatfield's answer is problematic.  He suggests the reason for the "two-step"

was to obtain Ludwig's consent *to search*.  But Chatfield never asked the Defendant for consent

to search – he asked for consent to continue questioning, to which the Defendant replied that

he'd rather not.  Thus Chatfield's explanation of why he felt compelled to tell the Defendant he

was free to go only to reinitiate contact moments later is troublesome.  If the Court is to accept

Trooper Chatfield's explanation of the events, then it must also accept that Ludwig was never

free to go at all, and that the Highway Patrol "two-step" as employed by Chatfield was nothing

more than an unabashed manipulation of the laws of search and seizure, deliberately engineered

to give Chatfield's encounter with the Defendant the false appearance of being voluntary.

But the facts suggest that Trooper Chatfield had not already decided to detain the

Defendant when he executed his "two-step," but rather that he reinitiated contact for the sole

purpose of gathering more information in an effort to grow an inarticulate hunch into a

reasonable suspicion that could justify detaining the Defendant.  When that effort was frustrated

by Ludwig's refusal to give consent, Chatfield acted anyway.

In *U.S. v. Wood* the Tenth Circuit addressed an almost identical paradigm, when a state

trooper's "two-step" approach was frustrated by an uncooperative motorist.  The Court noted that

"[t]he only additional event which occurred subsequent to the trooper's 'release' of Mr. Wood

and the decision to detain the vehicle was Mr. Wood's refusal to consent to a search of his car,

and it should go without saying that consideration of such a refusal would violate the Fourth

Amendment … The failure to consent to a search *cannot form any part of the basis for reasonable suspicion.*" *Id.* at 946 (Emphasis added).

While the *Wood* Court analyzed the facts of that case in terms of the defendant's refusal to consent to *search*, the same analysis must be applied to a defendant's refusal of consent to be seized.  Viewed any other way, the reasonable suspicion calculus becomes a damned if you do, damned if you don't approach, i.e., a trooper lacking reasonable suspicion to detain a motorist may ask for the driver's consent to further questioning, which if withheld would then provide the trooper with the reasonable suspicion necessary to seize the driver.  Such a result would be patently offensive to the Fourth Amendment and to common sense.

The Court should recognize the pivotal role Ludwig's refusal to consent played in Trooper Chatfield's decision to seize his person.  The Government is to be commended for not pursuing the argument that such refusal to give consent could have been incorporated into any objective determination of reasonable suspicion.  Nevertheless it is important to consider the role this factor played in Trooper Chatfield's *subjective* determination of whether he had any right to seize the Defendant.  A realization that Chatfield's "reasonable suspicion" rested so squarely upon the Defendant's exercise of a constitutional right helps the outside observer understand why the trooper would go to such lengths to later embellish and misrepresent the facts.

**RECALCULATING REASONABLE SUSPICION**

Deriving from the evidence that there was no shirt hanging in the window, that there was no masking agent in use, that the Defendant did not take an inordinately long time to pull over, that the contents of the car were not the Spartan trappings suggested, that there was nothing suspicious about the Defendant's travel plans, that a deliberate attempt by Trooper Chatfield to

25

supplement the record with questionable commentary was underway, that Trooper Chatfield provably lied when describing how the Defendant signed his speeding ticket, and that Trooper Chatfield's report was not written until well after the event in question, some time should be taken in recalculating what objective basis actually existed at the time for a reasonably prudent person to suspect criminal activity was afoot.  From the curious and deliberate commentary into his microphone at the beginning of the stop to his flagrant manufacturing of the facts of the case in his arrest report, to his use of the Defendant's refusal to consent to voluntary questioning as a factor in seizing Mr. Ludwig, Trooper Chatfield's performance should give this Court pause when considering what kind of deference to afford his testimony or "expertise."

Counsel brings to this Court's attention the fact that the State of Wyoming recently settled a civil lawsuit in which Trooper Chatfield was a named party, the subject of that lawsuit being Chatfield's violation of a motorist's Fourth Amendment rights, where on the same "hunch" rather than guessing correctly, Trooper Chatfield threatened an innocent motorist, took apart his vehicle on the side of the road and broke the motorists items.  While traditional deference to law enforcement is to be expected in most cases, such deference in this case risks a dangerous departure from the truth.

When the smoke has cleared, this Court is left with the Defendant's alleged nervousness, the Defendant's vehicle being registered to a third party, and the fact that the Defendant slept in his automobile the night before.  This is not, nor has it ever been a conglomeration of facts that could find that an officer would be warranted in detaining a motorist so situated against his will.

### THE DOG WAS CUED BY ITS HANDLER, NOT THE PRESENCE OF DRUGS

The government witness, Mr. Rispoli, testified at the suppression hearing that while the canine unit employed in the instant case was not trained to detect ecstasy, it *was* trained to detect

methamphetamine.  Hrg. Transcr. 66:23-67:8 (Dec. 3, 2008).  He opined that "I'm not a chemist but one of the components, one of the lesser included parts of MDMA is methamphetamine, and that is one of the substances that [the canine] is trained to find."  Hrg. Transcr. 67:5-8 (Dec. 3, 2008).

Mr. Rispoli is correct only with regards to his not being a chemist.  Contrary to the testimony presented this Court, methamphetamine is not a "component" or a "lesser included part" of methylenedioxymethamphetamine (MDMA).  Ecstasy is a single molecule, not a cocktail of lesser-included components as the government's witness wrongly asserts.  It is unto itself a single compound with a constant composition and fixed ratio of elements, *irreducible to any lesser parts*.  As such, the argument that a dog trained to alert to methamphetamine could detect ecstasy based solely on that training is plainly in error.  It is informative to consider the fact that drug detection dogs are often specifically trained to detect ecstasy in addition to being trained specifically to detect methamphetamine.  If ecstasy could be detected merely by training an animal to alert to methamphetamine, such additional training would be unnecessary.  Counsel for the Defendant has consulted with experts in the field of synthetic organic chemistry who have advised that the government's position and this Court's previous finding in the instant matter is absolutely, and scientifically proven to be false.

Federal law speaks to the same conclusion.  21 U.S.C. § 841(b)(1)(A)(viii) proscribes the distribution of "a mixture or substance containing a detectable amount of methamphetamine", while 21 U.S.C. 841(b)(1)(c) proscribes the distribution of ecstasy.  If the government's witness is correct that one of the "lesser included parts" of ecstasy is methamphetamine, then every criminal defendant charged with possession or distribution of ecstasy could also be charged with

27

possession or distribution of methamphetamine.  Oddly, the term of imprisonment available for this "substance containing a detectable amount of methamphetamine" far surpasses that for possession of ecstasy itself.  *Id*.  The unavoidable conclusion is that both modern scientists and the Legislature of the United States are sufficiently better informed than the government's tendered expert on drug canines, who while "not a chemist" so confidently testified to something so plainly outside of his expertise, without so much as a single question of *voir dire* from previous defense counsel.

In support of its argument that the canine here could mistake one substance for the other, the government cites to a single unreported case from the Eastern District of Pennsylvania, not for any finding of law, but for a finding of fact specific to that case which it mischaracterizes as applicable here.  Govt. Resp. at 14 (Nov. 7, 2008).  In *U.S. v. Fisher*, a police canine untrained in the detection of ecstasy, but trained to detect methamphetamine positively alerted to the presence of drugs outside a suspected narcotics laboratory where neither methamphetamine nor ecstasy was found.  *U.S. v. Fisher*, 2002 WL 563581, *1-3 (E.D. Pa. 2002).  At best tangentially relevant to this case since neither ecstasy nor methamphetamine was ever discovered, the government's expert in *Fisher* testified that "the odor associated with MDMA is consistent with the odor produced by the *manufacture* of methamphetamine."  *Id*. (Emphasis added).  The government cites to this case as proof that a dog trained to detect methamphetamine will also detect ecstasy.  Govt. Resp. at 15 (Nov. 7, 2008).  This Court cited Fisher in its previous order denying suppression, not for legal precedent, but for a factual finding.  Even assuming this Court could disregard the limitations of Fed. Rule. Evid. 201 and take judicial notice of a finding of fact from a case involving different parties in different circumstances, it cannot be concluded that because

a dog is trained to detect methamphetamine that it will alert to a substance that is similar in smell to components involved in the *manufacture* of methamphetamine.

As this Court has made clear, whether a dog is trained to alert to whatever substance may ultimately be found is of no relevance to a general determination of probable cause.  Should the fruits of the search be cocaine or coconuts, if the dog in question has a sufficiently reliable record, probable cause for a search exists once it has alerted.

The Defendant contends that the dog in question *was* cued by Trooper Chatfield to give a positive alert.  The evidence supports this.  Having consulted extensively with Steve Nicely of K9 Consultants of America, a nationally recognized expert in the fields of police dog training and animal behavior, counsel submits that the canine's "alert" was not induced by any odor of any kind, but by signals the animal received from Trooper Chatfield.

At approximately 13:43:49, Chatfield's video shows the dog in the general area of the driver's rear quarter panel.  The dog is oriented towards the vehicle and appears to be sniffing. The animal then turns toward the rear of the automobile and passes the driver's rear corner at approximately 13:43:50, turning its head toward the vehicle once again.  The dog then leaves the vehicle uninterested, returning to Chatfield who is standing off camera with a chew toy in his hand.  At 13:43:57 the dog returns to the rear driver's side corner and proceeds to the driver's door.  The dog looks away from the car at approximately 13:44:00 then turns toward the vehicle. The dog turns away again at approximately 13:44:03, then back to the vehicle. At 13:44:05 the dog looks in the direction of the handler then turns back toward the vehicle.  At 13:44:07 the dog again looks to the handler for a full three seconds, then back to the vehicle, then back to the handler, and then sits.  The expert consulted by the defense has reviewed the tape in question and

has described these actions as a classic demonstration of an animal being cued.  Unlike the government's witness who trained the very dog whose reliability was in question and thus possessed a clear financial interest in testifying to the reliability of his own product, defense counsel has retained an independent and well-regarded professional who has advised that beyond any doubt the dog's alert was not the result of the detection of drugs in the Defendant's car, but of signals received by Chatfield while he stands outside the field of vision of the camera with a chew toy in his hand.

### THE RELIABILITY OF THE DOG

A drug detection dog must be sufficiently reliable before any alerts by the animal may be used in the development of probable cause.  In *U.S. v. Kennedy*, 131 F.3d 1371 (10th Cir. 1997) the Tenth Circuit found that a 70-80% success rate meets the necessary standard of reliability. *Id*. at 1378.  In the case at bar, no mention or extrapolation of the dog's reliability was ever made by either the government or the Defendant's previous counsel.  However, a close examination of the record shows two very important findings can be discerned from the data provided.

First, as of the end of August, 2008, the dog in question had participated in 2404 total training evolutions.  Of these more than two thousand training events over the course of nearly eight years, Trooper Chatfield's canine has never failed to alert to the presence of drugs- *not a single time*.  Second, in the field performance records supplied by Trooper Chatfield, the numbers indicate that Chatfield's dog has alerted to the presence of drugs in *actual* traffic stops a total of fifty times.  Subsequent searches of those fifty vehicles only yielded actual narcotics twenty-eight times, for an overall accuracy of only fifty-eight percent in the real world, far below the 70-80% standard prescribed by *Kennedy*.

Only one of two explanations is possible for the inconsistencies between the dog's training records and its actual service.  The first is that the dog's training has not been conducted in a manner sufficiently realistic to ensure the animal's adequate performance in the field, and as such the dog here cannot be found reliable.  The second is that the dog's records have been intentionally misreported to give an otherwise unreliable animal the appearance of reliability.  In either case, no probable cause can be developed by an alert from Trooper's Chatfield's canine.  Nevertheless, at the suppression hearing, Chatfield testified that "to me the dog is reliable.  I trust him; that if he sits while sniffing around a vehicle, I'm gonna search that vehicle for hours because there's something in there."  Hrg. Transcr. 44:24-45:1 (Dec. 3, 2008).  Trooper Chatfield's testimony is clearly in opposition to the facts on record, namely that a full 42% of the time his canine alerts in actual traffic stops, no narcotic is present at all.

Chatfield coyly explains at the suppression hearing that such false alerts can't be counted against the dog's reliability because there is no way of knowing whether the dog may have been alerting to a residual odor from a substance once present but now missing from the automobile. Hrg. Transcr. 86:23-5 (Dec. 3, 2008).  "[T]here's really no way for us to confirm or deny that," he explains.  *Id*.  Mr. Rispoli testifies in a similarly troublesome manner.

Q. Are you aware of the term "false alert?"

A. Yes.

Q. What does that term mean to you?

A. In a perfect sterile situation, it would be where a dog would come in, and there has never been any -- under any circumstances or means of any kind anything that a dog is trained to find, and in the course of deployment the dog would give a behavior change or ultimately a final response, indicating that the dog is finding something.  Hrg. Transcr. 64:6-14 (Dec. 3, 2008).

Thus the government's position is that the only way a dog can be found to have falsely alerted is in a "perfect sterile situation" where there has "never … under any circumstances … of any kind [been] anything" that the dog in question has been trained to find. *Id*. As Trooper Chatfield correctly stated, "[T]here's really no way for us to confirm or deny that." Hrg. Transcr. 86:25 (Dec. 3, 2008). By this rationale, a dog which alerts 100% of the time to every automobile it ever smelled could still not be deemed unreliable, and law enforcement would be free to base otherwise foundationless searches on the fact that such an animal, far from being provably adequate, could not be proved not to be. Such calculus is overly convenient to the prosecution and palpably insincere. It asks this Court to take on faith a critical element of the government's case against the Defendant when the facts at hand unmistakably repudiate any such finding.

The further question remains, if Trooper Chatfield's canine is as reliable as he claims it is, then why did the trooper only consider the dog's alert to the outside of the vehicle, and not the animal's lack of alert once *inside* the vehicle?

Q. Okay. So you put him inside the trunk, and he -- and he didn't alert this -- at that time?

A. No, he did not.

Q. What did you do next?

A. I then put him inside the passenger compartment of the car.

Q. Did he alert inside the passenger compartment?

A. He never gave an alert, no.

Q. What did you next do?

A. I then put the dog back into the patrol car and began a hand search of the vehicle. Hrg. Transcr. 38:2-12 (Dec. 3, 2008).

It only seems logical that the subsequent *lack* of an alert from the dog once inside the vehicle's interior would be more indicative of the *absence* of contraband than any alert to the exterior could be of the *presence* of contraband.  Common sense dictates that if the dog could detect and respond to an odor emitting from the interior of the vehicle with the doors and trunk of the car fully closed, that dog would also detect and respond to the odor once those barriers were removed and the dog was closer to the perceived odor source.  The resolution of this inconsistency is simple and unavoidable.  Trooper Chatfield does not trust his canine nearly as much as he claims he does, but rather uses the dog's responses as a tool when convenient.

### CONCLUSION

The Government has argued that when applying the totality of the circumstances standard, "it would be wrong for a trial court to piecemeal view facts in isolation from each other, and to blindly reject facts that may--standing by themselves--be susceptible to an innocent explanation."  *Government's Response Brief* at 9.  But the application of the totality of the circumstances approach does not mean the Court is to abandon its scrutiny of each and every factor alleged, especially when almost all of them have been called into question by the evidence.  It is only then, once the Court has determined what and whom to believe, that *every* factor of the case must be considered – including the deliberate and undeniable attempts by Trooper Chatfield to manufacture the illusion of reasonable suspicion.

The Government suggests it would be inappropriate to inquire into each and every individual factor, but in *Salzano* the Tenth Circuit held that factors must be reviewed "both individually *and* in the aggregate."  *Salzano*, 1111 (*Emphasis added*).  Indeed it would be impossible to submit these factors for proper judicial scrutiny without examining them one by

33

one.

In *Wood* the Tenth Circuit held that "even though reasonable suspicion may be founded upon factors consistent with innocent travel, some facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." *Wood* at 946.  Therefore what the Defendant requests is not a "blind rejection" of the facts, but rather a pronouncement that after the wheat has been sifted from the overwhelming amount of chaff in the present case, the only factors remaining are too susceptible to varying interpretations to cause a man of reasonable caution to believe seizing the Defendant against his will could have ever been justified under the circumstances.

> "Reliance on the mantra 'the totality of the circumstances' cannot metamorphose these facts into reasonable suspicion. Although the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration *unless there are concrete reasons for such an interpretation*." *Id.* at 948. (*Internal citations omitted. Emphasis added*.)

After stripping away the factors which must be disregarded because they were manufactured by Chatfield, because they are wholly innocuous, or because they must necessarily be excluded from this analysis as a matter of law, this Court is left with precious little upon which a finding may be based supporting the legality of the seizure of Mr. Ludwig.  Under the totality of the circumstances, one thing is clear.  Trooper Chatfield's actions at best were an arbitrary exercise of police power, made especially contemptible by his deliberate and dishonest attempts to conceal that wrongdoing at the expense of his profession's integrity.  To sanction such abuse upon this weakest of justifications would be to invite and encourage illicit police conduct.  Because Trooper

Chatfield detained the Defendant without reasonable suspicion and in violation of the Fourth Amendment, the evidence discovered in his vehicle is tainted by his unlawful conduct and must be suppressed.  *Wong Sun v. U.S.*, 371 U.S. 471, 484-86 (1963).

**WHEREFORE**, the Defendant, Sergei Paul Ludwig, moves to suppress all evidence taken as a result of this illegal seizure and search, and any and all statements and evidence derived therefrom as fruits of the poisonous tree.

DATED this 4th day of April, 2009.

Respectfully submitted,

*/s/ Tom Fleener*
Thomas A. Fleener
The Law Office of Thomas A. Fleener, P.C.
119 Grand Ave.
PO Box 913
Laramie, WY 82073
307-460-4333

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on the 5th day of April, 2009, by district court electronic submission to all parties.

/s/ *Tom Fleener*
Thomas A. Fleener